

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 JUL -5 AM 11: 24

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

ROY ABRAHAM, ET AL                 CIVIL ACTION

versus                                 No. 04-0044

B.J. SINGH, ET AL                    SECTION: I/5

### ORDER AND REASONS

Before the Court are the following motions filed on behalf of defendants, Chad Chandler and Falcon Steel Structures, Inc., with respect to plaintiffs' first amended complaint:

(1)      Motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3) and (b)(6)[1];

(2)      Motion to dismiss pursuant to Fed. R. Civ. P. 9(b)[2];

(3)      Motion to sever pursuant to Fed. R. Civ. P. 20(a) for misjoinder of plaintiffs[3].

For the following reasons, the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(3) and (b)(6), filed on behalf of defendants, Chad Chandler and Falcon Steel Structures, Inc. is **DENIED IN PART**, **GRANTED IN PART** and **DISMISSED IN PART** as moot; the motion to dismiss pursuant to Fed. R. Civ. P. 9(b), filed on behalf of defendants, Chad Chandler and Falcon Steel

---

[1]Rec. Doc. No. 25.

[2]Rec. Doc. No. 26.

[3]Rec. Doc. No. 27.

___ Fee_____
___ Process_____
 X  Dktd_____
___ CtRmDep_____
___ Doc. No._____

1

Structures, Inc., is **DENIED IN PART** and **DISMISSED IN PART** as moot; the motion to sever

pursuant to Fed. R. Civ. P. 20(a) for misjoinder of plaintiffs filed on behalf of defendants, Chad

Chandler and Falcon Steel Structures, Inc., is **DISMISSED** as moot.

## *BACKGROUND*

I.    *The First Amended Complaint*[4]

Plaintiffs are 167 citizens of India who were allegedly recruited by defendants in India,

Dubai, and Singapore to work as steelworkers in the United States. Defendant, Chad Chandler, is

the president and owner of defendant, Falcon Steel Structures, Inc. ("FSS"). According to the

complaint, defendants traveled to India, Dubai, and Singapore to recruit plaintiffs to work as

steelworkers for FSS.[5] Plaintiffs allege that, during the recruitment process, defendants promised

them full-time employment with FSS for at least two years.[6] In addition to certain terms of

employment with respect to pay and employee benefits,[7] the first amended complaint states that

defendants promised to obtain for plaintiffs permanent resident status in the United States.[8]

Plaintiffs assert that in return for offering this employment opportunity, defendants demanded and

---

[4]This action was originally filed on January 8, 2004. *See* Rec. Doc. No. 1. Plaintiffs filed a first amended complaint on June 28, 2004. Rec. Doc. No. 22, first amended complaint ("Amd. Comp."). The first amended complaint supersedes the original complaint and it incorporates by reference affidavits filed by 150 individual plaintiffs. *See id.*, ¶ 14; *see also* Rec. Doc. No. 9, App. A-C, plaintiffs' affidavits ("Pl. Affs."); Rec. Doc. No. 24. Pursuant to Fed. R. Civ. P. 10(c), the affidavits are a part of the first amended complaint for all purposes. *See id.* ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

[5]Amd. Comp., ¶ 15.

[6]*Id.*, ¶ 17. According to the complaint, some plaintiffs were promised three years of employment. *Id.*

[7]Plaintiffs allege that defendants promised to pay plaintiffs regular wages of $14.00 per hour and $21.00 per hour overtime pay. Plaintiffs also allege that defendants promised to provide medical benefits, health insurance and cost-free housing. *Id.*, ¶ 16.

[8]*Id.*

received payment of a fee ranging from $7,000.00 to $20,000.00 from each plaintiff.[9]  Plaintiffs

allege that they sold various personal property and/or borrowed money from various third parties

located abroad, often at usurious rates, in order to obtain the funds necessary to pay the fee charged

by defendants for the opportunity to work in the United States for FSS.[10]  Plaintiffs allege that

defendants' promises of employment were false and that defendants knew that plaintiffs would not

be able to recoup the money paid in fees without full-time employment in the United States.

According to plaintiffs, their indebtedness to third parties abroad effectively bound plaintiffs to

defendants.[11]

Plaintiffs allege that defendants represented that Terry Forrester[12] was an attorney who would

handle all immigration matters and visa renewals and that Forrester would obtain permanent resident

status for plaintiffs in exchange for plaintiffs' payment of the aforementioned fees and their

agreement to work for FSS for a period of two to three years.[13]  Plaintiffs allege that between

---

[9]*Id.*, ¶ 18.

[10]*See id.*, ¶ 22.  For example, some plaintiffs declare that they borrowed money from friends and family members to pay the recruitment fee.  *E.g.*, Pl. Aff. No. 3, affidavit of Krishnan Raju Indukuri, at 1 ($7500.00 loan obtained from father-in-law at 6% interest); Pl. Aff. No. 57, affidavit of Satturi Simhachalam, at 1 ($13,000.00 loan obtained from friends at 5% interest).  Other plaintiffs state that they obtained loans in India from loan sharks or other private lenders at high interest rates.  *E.g.*, Pl. Aff. No. 63, affidavit of Varchese Matthews, at 2 ($9,800.00 loan obtained from loan shark at 36% interest and $1,000.00 loan from bank at 11% interest); Pl. Aff. No. 111, affidavit of Karuna Karan Kizhakke Veettil, at 1 ($7000.00 loan obtained from a "financing company" at 98% interest).  Still others declare that either they or other persons sold or mortgaged property to obtain money to pay the defendants.  *E.g.*, Pl. Aff. No. 21, affidavit of John Kunjachan Mundattinkal, at 1 (stating that $1,000.00 of an $8,000.00 service fee was obtained through the sale of his wife's gold); Pl. Aff. No. 126, affidavit of Venkata S. Murthy Patta, at 1 (stating that he obtained a $4,500.00 mortgage on his land at 3% interest).

[11]Amd. Comp., ¶ 20.

[12]Terry Forrester and Labor Consultants Internationál, L.L.C. were dismissed from this litigation on June 2, 2005.  Rec. Doc. No. 99.

[13]*Id.*, ¶ 23.

November and December of 2002, defendants obtained H-2B visas for plaintiffs.[14] They assert that

FSS appeared on the visas as plaintiffs' sponsoring employer and that defendants misrepresented to

immigration officials the necessary prerequisites for securing such visas, including the condition of

the economy in southern Louisiana and the ability of FSS to employ plaintiffs.[15]

According to the first amended complaint, defendants arranged for plaintiffs' transportation

to New Orleans and Houma, Louisiana. Upon plaintiffs' arrival, defendants allegedly took plaintiffs'

passports and other travel documents, transported plaintiffs to a hotel in Houma, and ordered

---

[14] The term "H-2B" is derived from section 101(a)(15)(H) of the Immigration and Nationality Act ("INA"), which authorizes the admission of aliens to perform unskilled work of a temporary nature. 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *Morante-Navarro v. T&Y Pine Straw, Inc.*, 350 F.3d 1163, 1166 (11th Cir. 2003). The statute excludes such aliens from the definition of "immigrants" and defines such a person as "an alien . . . having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country." § 1101(a)(15)(H)(ii)(b). As provided in 8 C.F.R. § 214.2(h)(1)(i):

> Under section 101(a)(15)(H) of the Act, an alien may be authorized to come to the United States temporarily to perform services or labor for, or to receive training from, an employer, if petitioned for by that employer. Under this nonimmigrant category, the alien may be classified as . . . an alien coming to perform other temporary services or labor . . . .
>
> The employer must file a petition with the [Immigration and Naturalization] Service [,now called the Bureau of Citizenship and Immigration Service,] for review of the services or training and for determination of the alien's eligibility for classification as a temporary employee or trainee, before the alien may apply for a visa or seek admission to the United States.

*Id.* (alteration supplied).

> An H-2B classification applies to an alien who is coming temporarily to the United States to perform nonagricultural work of a temporary or seasonal nature, if unemployed persons capable of performing such service or labor cannot be found in this country. . . . The temporary or permanent nature of the services or labor to be performed must be determined by the service. This classification requires a temporary labor certification issued by the Secretary of Labor or the Governor of Guam, or a notice from one of these individuals that such a certification cannot be made, prior to the filing of a petition with the [Bureau of Citizenship and Immigration] Service.

§ 214.2(h)(1)(ii)(D)(alteration supplied).

[15]*Id.*, ¶¶ 24, 25.

plaintiffs to remain there until work could be found for them.[16]  While they were housed in Houma, plaintiffs contend that little or no food was provided and that there was no medical attention provided.[17]  Plaintiffs aver that they eventually learned that FSS was not a manufacturing facility and, contrary to defendants' alleged representations to them and United States immigration officials, that FSS could not employ them.  Instead, according to plaintiffs, defendants intended to place plaintiffs in positions with Quality Shipyards located in Houma and skim money from their wages.[18]  When some plaintiffs were placed in employment at Quality Shipyards, such plaintiffs assert that they were not paid the promised rates of pay.  Additionally, plaintiffs allege that defendants assessed certain unidentified fees against them and deducted such fees from their paychecks without their consent.  Thereafter, plaintiffs assert that defendants demanded that plaintiffs pay an additional $5,000 in order to obtain a permanent labor certificate.[19]

Plaintiffs assert that they were compelled to work in order to pay the alleged fees assessed against them by threats of physical violence, threats of deportation, manipulation of their visa status, and defendants' confiscation of plaintiffs' passports.[20]  With respect to plaintiffs who were not placed in employment by defendants, the complaint states that defendants instructed them to find their own jobs, in violation of the conditions of their visas.  In the event that any plaintiffs obtained work, plaintiffs were to report such employment to defendants.  The complaint alleges that some of those

---

[16]*Id.*, ¶¶ 26, 27.

[17]*Id.*, ¶ 31.

[18]*Id.*, ¶¶ 29, 30.

[19]*See id.*, ¶¶ 33-36, 42.

[20]*See id.*, ¶ 37.

plaintiffs were eventually arrested by United States immigration authorities for seeking such employment.[21]

Plaintiffs allege that by threats of deportation, manipulation of work visa status, threats of violence, creation of false debts, and threats to abuse the legal process, defendants created a terrorized and dependent labor pool of foreign workers, the creation of which permitted defendants to continue to "farm out" such workers as temporary employees to third parties while skimming arbitrary fees from plaintiffs' wages. At the same time, plaintiffs allege that defendants prevented them from obtaining permanent employment anywhere other than FSS by discouraging other employers from hiring them. According to plaintiffs, defendants' conduct ultimately prevented them from repaying the loans, initially obtained overseas in order to participate in defendants' recruitment effort, because plaintiffs failed to receive the promised steady flow of income in the United States.[22]

On January 8, 2004, plaintiffs filed the instant action.[23] The first amended complaint was filed on June 28, 2004.[24] Plaintiffs assert three causes of action in the first amended complaint. In count 1, plaintiffs allege a cause of action pursuant to the Victims of Trafficking and Violence Protection Act of 2000 ("Victims Protection Act"), 22 U.S.C. § 7101, *et seq.*, and the Trafficking Victims Protections Reauthorization Act of 2003 ("TVPRA"), 18 U.S.C. § 1595. In count 2, plaintiffs assert a state law cause of action for breach of contract and fraudulent inducement to enter into a contract. In count 3, plaintiffs assert a civil cause of action pursuant to the Racketeer

---

[21]*Id.*, ¶¶ 39, 40.

[22]*See id.*, ¶¶ 43-48.

[23]*See* Rec. Doc. No. 1.

[24]Rec. Doc. No. 22.

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962.

### LAW AND ANALYSIS

I.      *Motion to Dismiss for Improper Venue Pursuant to Fed. R. Civ. P. 12(b)(3).*

Plaintiffs filed this action alleging jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Plaintiffs allege that venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. §§ 1391(a)(2), (b)(2) and 1965. Defendants, Chad Chandler and FSS, have moved to dismiss plaintiffs' first amended complaint for improper venue pursuant to Fed. R. Civ. P. 12(b)(3).

A RICO plaintiff may establish proper venue pursuant to either the general venue statute, 28 U.S.C. § 1391, or the special RICO venue provision, 18 U.S.C. § 1965(a). *Bigham v. Envirocare of Utah, Inc.*, 123 F. Supp. 2d 1046, 1047 (S.D. Tex. 2000). Section 1391(a), by its express terms, applies only when federal subject matter jurisdiction is based solely upon diversity of citizenship. § 1391(a). Plaintiffs do not allege that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. When federal subject matter jurisdiction is not based solely upon diversity, as is the case here, venue pursuant to the general venue statute is governed by § 1391(b). *Bigham*, 123 F. Supp. 2d at 1047. Accordingly, plaintiffs' allegation of proper venue pursuant to § 1391(a)(2) does not support venue in this district with respect to this federal question case.

Section 1391(b) provides, in pertinent part, "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in . . .(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." The majority of courts conform to the standard that once a defendant has raised the issue of improper venue by motion, the burden is on the plaintiff to sustain the choice of venue.

*Laserdynamics Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 390 (S.D. Tex. 2002) (citing *McCaskey v. Cont'l Airlines Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001), and *Bigham*, 123 F. Supp. 2d at 1048); *see also* 5 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3826 (2d ed. 1986) ("There are cases holding that the burden is on the objecting defendant to establish that venue is improper. But the better view, and the clear weight of authority, is that, when objection has been raised, the burden is on the plaintiff to establish that the district he chose is a proper venue.") (internal quotation and citations omitted). "In the absence of an evidentiary hearing on the matter, courts will allow a plaintiff to carry the burden by establishing facts, taken as true, that establish venue." *Laserdynamics*, 209 F.R.D. at 390. The uncontroverted facts contained in the plaintiff's complaint will be taken as true and any factual conflicts demonstrated in the parties' documents and affidavits will be resolved in the plaintiff's favor. *See id.* (citing *McCaskey*, 133 F. Supp. 2d at 523).

The first amended complaint states, *inter alia*, that defendants (1) arranged for transportation of plaintiffs from overseas to the Eastern District of Louisiana; (2) hoped to place plaintiffs for work with Quality Shipyards located in Houma, Louisiana, which is located within the Eastern District of Louisiana; (3) housed plaintiffs in a Houma hotel while allegedly denying plaintiffs food and medical attention; (4) took plaintiffs' passports while plaintiffs were housed in Houma; (5) placed some plaintiffs in employment in Houma while allegedly skimming arbitrary fees from plaintiffs' paychecks; (6) breached the alleged employment contract in the Eastern District of Louisiana; (7) demanded payment of certain fees from plaintiffs and accepted such fees in the form of checks drawn on financial institutions located with the Eastern District of Louisiana; and (8) allegedly threatened plaintiffs while they were housed and/or employed in the Eastern District of Louisiana. Taking these

allegations as true, these facts, among others, are a substantial part of defendants' alleged conduct giving rise to the causes of action alleged in the complaint.

Defendants argue that the Middle District of Louisiana, not the Eastern District of Louisiana, is the proper venue for this action because FSS's corporate offices are located in Baton Rouge, Louisiana and because Chandler recruited plaintiffs from FSS's Baton Rouge office. However, even assuming that such conduct occurred in the Middle District of Louisiana and may be considered substantial, such conduct does not render venue in this district improper. The fact that substantial activities took place in another district does not disqualify this district as a proper venue pursuant to § 1391 even if such conduct was more substantial, or even the most substantial, so long as substantial activities occurred in this district. *See Sun Drilling Prods. Corp. v. Tex. Mex. Ry. Co.*, No. Civ. A. 04-2266, 2004 WL 2256070, at * 6 n.8 (E.D. La. Oct. 5, 2004) (quoting the official commentary to 28 U.S.C. § 1391). In other words, venue may be proper in more than one federal judicial district. *See Godwin Gruber, P.C. v. Lambert*, No. Civ. A. 03-1095, 2004 WL 813229, at *5 (N.D. Tex. Apr. 13, 2004) (citing *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998)).

Because plaintiffs have alleged facts, taken as true, which support venue pursuant to § 1391(b)(2), this Court need not reach the issue of whether venue is also proper pursuant to the special RICO venue provision, 18 U.S.C. § 1965(a). Accordingly, defendants' motion to dismiss for improper venue is **DENIED.**

II.     *Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)*

A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts

in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). This Court will not look beyond the factual allegations in the pleadings to determine whether relief should be granted. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). In assessing a complaint, a court must accept all well-pleaded facts in the complaint as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey,* 197 F.3d at 774; *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). "However, '[i]n order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . .'" *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)) (alteration in original). "'[C]onclusory allegations and unwarranted deductions of fact are not admitted as true' by a motion to dismiss." *Id.* (quoting *Assoc. Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1994)). Moreover, "'legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Blackburn*, 42 F.3d at 931(quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993)). "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (internal quotation and citation omitted).

A.    *Motion to Dismiss Plaintiffs' Victims Protection Act/TVPRA Claim (Count 1)*

Defendants move to dismiss plaintiffs' human trafficking cause of action brought pursuant to the Victims of Trafficking and Violence Protection Act of 2000 ("Victims Protection Act"), Pub.

10

L. No. 106-386, 114 Stat. 1464 (codified at 22 U.S.C.A. §§ 7101-7110 (West 2004)), as amended

by the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-

193, 117 Stat. 2875 (December 19, 2003).  Defendants argue that the Victims Protection Act does

not provide a private right of action for trafficking in persons and that the provision providing for

a private cause of action pursuant to the TVPRA, 18 U.S.C. § 1595(a), which became effective

December 19, 2003, is not retroactive.  Plaintiffs have not provided <u>any</u> argument in opposition to

defendants' motion to dismiss count 1 of the first amended complaint.

      1.     Victims Protection Act

Congress enacted the Victims Protection Act to "combat trafficking in persons, a

contemporary manifestation of slavery whose victims are predominantly women and children, to

ensure just and effective punishment of traffickers, and to protect their victims."  22 U.S.C. §

7101(a).  The Victims Protection Act authorizes the President of the United States and other

members of the executive branch to, *inter alia*, establish and carry out programs and international

initiatives in order to: (1) curtail trafficking in persons; (2) ensure that foreign governments establish

minimum standards for deterring and punishing such trafficking; and (3) enable the United States

government to withhold non-humanitarian, non-trade related aid to foreign governments that fail to

comply with the minimum standards for the prevention of trafficking in persons.  *See* 22 U.S.C. §§

7103-7107.  The Victims Protection Act also authorizes the President to sanction foreign persons

who engage in the trafficking of persons, 22 U.S.C. § 7108(a), and it authorizes the United States

Sentencing Commission to amend the sentencing guidelines applicable to those persons who are

convicted of human trafficking offenses.  22 U.S.C. § 7109.

The Victims Protection Act does not contain any express provision providing for a private

cause of action to enforce the provisions of the statute. It is well-settled that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S. Ct. 1511, 1519, 149 L. Ed. 2d 517 (2001) (citation omitted). When a federal statute does not expressly provide for a private right of action, a plaintiff "bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the statute." *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521-22 (5th Cir. 2002). "In other words, he must overcome the familiar presumption that Congress did not intend to create a private right of action." *Id.* (citing *La. Landmarks Soc'y, Inc. v. City of New Orleans*, 85 F.3d 1119, 1123 (5th Cir. 1996)). Ordinarily, whether an implied cause of action exists for the violation of a federal statute is governed by the four factor test set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975).[25] The touchstone of the *Cort* analysis is its second factor, *i.e.*, whether there is any evidence of congressional intent to create a private cause of action. *Casas*, 304 F.3d at 522. Absent a showing of Congressional intent to create a private cause of action, "courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87, 121 S. Ct. at 1520. To sustain their burden of establishing that Congress intended to create a private right of action, plaintiffs must demonstrate that there is "affirmative evidence" of congressional intent to create a private right of action. *Casas*, 304 F.3d

---

[25]The four factor test is as follows:
> (1) Is this plaintiff a member of the class for whose "especial" benefit the statute was passed? In other words, does the statute create a federal right for this plaintiff?
> (2) Is there any evidence of legislative intent, either explicit or implicit, to create or deny a private remedy?
> (3) Is it consistent with the legislative scheme to imply a private remedy?
> (4) Is the cause of action one traditionally relegated to state law so that implying a federal right of action would be inappropriate?

*La. Landmarks Soc.*, 85 F.3d at 1122 -23.

at 522.

Plaintiffs have completely failed to offer any support, either legal or factual, for finding an implied right of action to enforce the Victims Protection Act. Accordingly, the Court finds that plaintiffs have failed to carry their burden to overcome the presumption that Congress did not intend to create a private right of action for violations of the Victims Protection Act when no such action is expressly created by Congress.

2.     TVPRA

The TVPRA expressly authorizes civil remedies for victims of "peonage, slavery, and trafficking." 18 U.S.C. § 1595 (West Supp. 2004). The statute provides that "an individual who is a victim of a violation of section 1589, 1590, or 1591 . . . may bring a civil cause of action against the perpetrator . . . and may recover damages and reasonable attorneys fees." *Id.*[26] Although plaintiffs do not specifically identify the provision which they believe defendants violated, the allegations with respect to the cause of action pursuant to the TVPRA tracks the language of § 1590,

---

[26]18 U.S.C. § 1589 provides, in pertinent part:
> Whoever knowingly provides or obtains the labor or services of a person--
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
> (3) by means of the abuse or threatened abuse of law or the legal process,
> shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.

18 U.S.C. § 1590 provides, in pertinent part:
> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1591, not relevant in this case, pertains to sex trafficking in children.

13

which makes it unlawful for anyone to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of [Title 18, Chapter 77 of the United States Code]."[27]

The TVPRA was enacted, and became effective, on December 19, 2003. *See* Pub. L. No. 108-193, 117 Stat. 2875. Plaintiffs have not alleged any facts which demonstrate that defendants recruited, harbored, transported, provided, or obtained any of the plaintiffs subsequent to December 19, 2003. The allegations in plaintiffs' complaint and plaintiffs' affidavits attached thereto encompass defendants' alleged conduct between November, 2000, and December, 2002.[28] Defendants argue that because plaintiffs' factual allegations involve conduct which occurred prior to the enactment of the TVPRA, plaintiffs have failed to state a claim upon which relief may be granted because the TVPRA cannot be applied retroactively.

The resolution of the issue of whether a federal statute may be applied retroactively to conduct occurring prior to the statute's enactment is governed by the two-step analysis set forth by the United States Supreme Court in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). In *Landgraf*, the Supreme Court held that "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Id.* at 280, 114 S. Ct. at 1505. If Congress has

---

[27]*See* Amd. Comp., ¶ 52. Chapter 77 contains criminal statutes which make it a crime to hold people in a condition of peonage, 18 U.S.C. § 1581, entice people into slavery, 18 U.S.C. § 1583, and sell people into involuntary servitude, 18 U.S.C. § 1584. The first amended complaint states:

> Defendants knowingly, willfully and intentionally recruited, harbored, transported, provided or obtained the Plaintiffs for labor or services through the use of fraud, force and coercion for the purpose of subjecting Plaintiffs to involuntary servitude, peonage, debt bondage or slavery, all for Defendants' financial gain.

Amd. Comp., ¶ 52.

[28]*See id.*, ¶¶ 24, 38; *see also id.*, apps. A-C.

clearly expressed whether the statute should apply retroactively, the inquiry ends. *See id.*; *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 297 (5th Cir. 2002). However, if the statute does not contain such an express command, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280, 114 S. Ct. at 1505. "If the court decides that the statute would have an impermissible retroactive effect if applied to past conduct, *Landgraf* instructs that the statute does not apply retroactively." *Ojeda-Terrazas*, 290 F.3d at 297. If a statute would operate retroactively if it was applied in a given case, the "traditional presumption" against statutory retroactivity applies and the statute does not govern the case absent clear congressional intent favoring retroactive application. *See Landgraf*, 511 U.S. at 280, 114 S. Ct. at 1505.

Applying the foregoing principles, the *Landgraf* Court held that § 102 of the Civil Rights Act of 1991, which, *inter alia*, expanded the monetary relief available to Title VII plaintiffs to include compensatory damages for unlawful discrimination, was "the kind of provision that does not apply to events antedating its enactment in the absence of clear congressional intent." *Id.* at 283, 114 S. Ct. at 1506. Finding no clear congressional intent favoring the application of § 102 to events predating the statute's enactment, the Court held that the statute did not apply to cases arising before its enactment. *See id.* at 286, 114 S. Ct. at 1508.

In its discussion of that part of § 102 pertaining to the addition of compensatory damages as a remedy for violations of Title VII, the Court noted that the statute did not impose liability on private parties for conduct that was lawful when it occurred. *See id.* at 282, 114 S. Ct. at 1506 ("§ 102 only reaches discriminatory conduct already prohibited by Title VII."). Additionally, the Court

noted that any concerns about a lack of fair notice to private parties with respect to what type of conduct was unlawful was further muted because private parties were already subject to monetary liability for unlawful discrimination in the form of backpay. *Id.* Nonetheless, the Court concluded that the statute operated retroactively because it "would attach an important new legal burden to that [discriminatory] conduct." *Id.* at 283, 114 S. Ct. at 1506. The Court reasoned that even if § 102 was viewed as simply increasing the amount of damages available under a pre-established cause of action, the statute would "undoubtedly impose on employers found liable a 'new disability' in respect to past events." *Id.* at 283, 114 S. Ct. at 1507 (citation omitted). The Court emphasized that "[t]he *extent* of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored." *Id.* at 283-84, 114 S. Ct. at 1507 (emphasis in original); *see also id.* at 283 n.35, 114 S. Ct. at 1506 n.35 ("Even when the conduct in question is morally reprehensible or illegal, a degree of unfairness is inherent whenever the law imposes additional burdens based on conduct that occurred in the past.") (citation omitted).

Applying the foregoing principles, the Court agrees with defendants that § 1595 of the TVPRA cannot be applied retroactively to conduct occurring prior to December 19, 2003. There is no language in the statute which demonstrates that Congress "expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280, 114 S. Ct. at 1505. Additionally, the Court finds that the statute, if applied to conduct occurring prior to December 19, 2003, would have an impermissible retroactive effect because the imposition of monetary liability for violations of Chapter 77 would unquestionably "increase a party's liability for past conduct." *Id.* By establishing a private right of action for violations of the criminal statutes in Title 18, Chapter 77, Congress has increased a party's liability and created a new disability for engaging in such conduct. Although the primary conduct

16

prohibited in Chapter 77 was criminal prior to the time frame alleged in the first amended complaint, the *Landgraf* Court made clear that the issue of whether a statute has a retroactive effect is not limited to the situation where conduct, previously lawful, has been subsequently declared unlawful by Congress. Instead, the question turns on whether a statute imposes a new legal burden on a defendant with respect to past events. Because § 1595 would impose such a burden by subjecting parties to private lawsuits and monetary liability, the Court finds that plaintiffs may not sustain a cause of action pursuant to that statute absent clear congressional intent favoring retroactive application. Plaintiffs have failed to cite any authority demonstrating such congressional intent and this Court's independent research has revealed none. Therefore, the Court finds that plaintiffs' may not sustain a cause of action pursuant to § 1595.

Because the Victims Protection Act does not provide a private cause of action, and because the private cause of action created in § 1595 cannot be applied retroactively to the conduct alleged in the first amended complaint, defendants' motion to dismiss count 1 of the complaint is **GRANTED.**

B.     *Motion to Dismiss Plaintiffs' RICO Claims (Count 3)*

Plaintiffs have alleged RICO claims pursuant to 18 U.S.C. § 1962(a), (b), (c), and (d).[29] The

------

[29]18 U.S.C. § 1962 provides in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Fifth Circuit has summarized these subsections as follows:

> Reduced to their simplest terms, these subsections state that:
> (a) a person who has received income from a pattern of racketeering activity cannot invest that income in an enterprise;
> (b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;
> (c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and
> (d) a person cannot conspire to violate subsections (a), (b), or (c).

*Crowe v. Henry*, 43 F.3d 198, 203 (5th Cir. 1995); *In re Burzynski*, 989 F.2d 733, 741 (5th Cir. 1993).  The common elements of any RICO claim brought pursuant to any of the four substantive subsections of § 1962 are the following: "1) a *person* who engages in  2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an *enterprise*." *Id.* at 204 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988))(internal quotation marks omitted)(emphasis in original); *see also Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996); *In re Burzynski*, 989 F.2d at 741.

After a RICO claim is filed, the United States District Court for the Eastern District of Louisiana issues a standing order[30] pursuant to which plaintiffs are required to file a RICO case statement including, *inter alia,* the facts plaintiffs rely upon to initiate their RICO complaint. A

---

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

[30]Adopted *en banc* on June 3, 1987.

district court, in deciding a motion to dismiss, must consider both the well-pleaded facts in a complaint and the facts alleged in the RICO case statement filed in accordance with the standing order. *See Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992).

    C.    *RICO "Person"*

In either a criminal or civil RICO action, the RICO "person" is the defendant. *Crowe*, 43 F.3d at 204 (citation omitted). The RICO statute defines a "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Plaintiffs have alleged that defendants are "persons" within the meaning of the statute because they are capable of holding a legal or beneficial interest in property.[31] Defendants do not dispute that they meet the RICO definition of a "person." Accordingly, the Court finds that plaintiffs have adequately alleged the "person" element of their RICO claim.

    D.    *Pattern of Racketeering Activity*

The second element, a "pattern of racketeering activity," has two components: "1) predicate acts – the requisite racketeering activity, and 2) a pattern of such acts." *Burzynski*, 989 F.2d at 743. "Racketeering activity" consists of various predicate offenses defined in 18 U.S.C. § 1961(1) (defining "racketeering activity"). A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5); *see Word of Faith*, 90 F.3d at 122. In order to sustain a RICO claim, a plaintiff must plead "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900, 106 L. Ed. 2d 195 (1989); *Burzynski*, 989 F.2d at 742.

---

[31]Amd. Comp., ¶¶ 64-67.

1.    <u>Predicate Acts</u>

Plaintiffs allege that defendants committed numerous predicate acts in violation of 18 U.S.C.

§§ 1956 (money laundering), 1581 (peonage), 1546 (fraud in the H-2B visa process), 1952 (Travel

Act violations), 1951 (Hobbs Act violations), and 8 U.S.C. § 1324 (bringing in and harboring certain

aliens).  In order to sustain a substantive RICO claim against any individual defendant pursuant to

§ 1962(a)-(c), the complaint must contain facts from which it can be reasonably inferred that each

defendant committed at least two predicate acts.  *See  United States v. Sutherland*, 656 F.2d 1181,

1203 (5th Cir. 1981).  To sustain a claim based upon an alleged RICO conspiracy, plaintiffs need

only allege facts that demonstrate an agreement to commit at least two predicate acts.  *See id.*; *see*

*also Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1141 (5th Cir. 1992).

a.    Peonage in Violation of 18 U.S.C. § 1581

18 U.S.C. § 1581 provides:

> Whoever holds or returns any person to a condition of peonage, or
> arrests any person with the intent of placing him in or returning him
> to a condition of peonage, shall be fined under this title or imprisoned
> not more than 20 years, or both.

"Peonage is a status or condition of compulsory service or involuntary servitude based upon

a real or alleged indebtedness." *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944).  The "basal

fact" of peonage is indebtedness to the "master." *Reynolds v. United States*, 235 U.S. 133, 144, 35

S. Ct. 86, 88, 59 L. Ed. 162 (1914); *Clyatt v. United States*, 197 U.S. 207, 215, 25 S. Ct. 429, 430,

49 L. Ed. 726 (1905).  The indebtedness to a "master" creates a condition of compulsory service.

*Clyatt*, 197 U.S. at 215, 25 S. Ct. at 430.  Peonage status may be created by either voluntary or

involuntary conduct of the peon, "[b]ut peonage, however created, is compulsory service, –

involuntary servitude." *Id.* However, "a clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt." *Id.* As explained by the Supreme Court:

> In the latter case [*i.e*, voluntary performance of labor,] the debtor, though contracting to pay his indebtedness by labor or service, and subject, like any other contractor, to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service.

*Id.* at 215-16, 25 S. Ct. at 430. Therefore, the critical elements of a peonage claim are indebtedness and compulsion. *See Reynolds,* 235 U.S. at 144, 35 S. Ct. at 88; *Pierce*, 146 F.2d at 86 (concluding that a claim of peonage is sustainable when victim alleges and proves that he is held against his will and made to work to pay a debt); *see also Dolla v. Unicast Co.*, 930 F. Supp. 202, 205 (E.D. Pa. 1996); *Turner v. Unification Church*, 473 F. Supp. 367, 375 (D.R.I.1978) (Peonage is "compulsory service based upon the indebtedness of the peon to the master.").

"Involuntary servitude" has been defined by the United States Supreme Court as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *United States v. Kozminski*, 487 U.S. 931, 952, 108 S. Ct. 2751, 2765, 101 L. Ed. 2d 788 (1988). In *Kozminski*, the Supreme Court noted that it was possible that, given a plaintiff's special vulnerability, "threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude," *Id.* at 984, 108 S. Ct. at 2762. However, the Court emphasized that a plaintiff is not subjected to involuntary servitude "whenever an employee asserts that his will to quit has been subdued by a threat which seriously affects his future welfare but as to which he still has a choice, however painful." *Id.* at 949, 108 S. Ct. at 2763; *see also Watson v.*

21

*Graves*, 909 F.2d 1549, 1552 (5th Cir. 1990)(rejecting a claim of involuntary servitude noting that "[t]he choice of whether to work outside of the jail for twenty dollars a day or remain inside the jail and earn nothing may have indeed been 'painful' and quite possibly illegal under state law, but the evidence shows that neither [plaintiff] was forced to work or continued to work against his will."); *Doe I v. The Gap, Inc.*, No. Civ. A. 01-0031, 2001 WL 1842389, at *21 (D. N. Mar. I. November 26, 2001)("Courts have repeatedly held that the financial consequences attending the quitting of one's job make the choice between continuing to work under adverse conditions and quitting employment an unpleasant choice, but nevertheless a choice.")(citations omitted).

Defendants argue that plaintiffs have not stated a claim of peonage in violation of § 1581 because plaintiffs have failed to allege that plaintiffs owed a debt to the defendants or that plaintiffs were held against their will and forced to work for defendants to satisfy any debt. Plaintiffs acknowledge that their description of indebtedness is unclear, but argue that defendants are to blame for their inability to clarify their theory of indebtedness because plaintiffs are "still unaware of the basis for the fees assessed and collected from them, though they do allege that there was no legitimate basis for the deductions."[32]

The Court agrees with defendants that plaintiffs' peonage claim fails because there are no facts to support an inference that plaintiffs were compelled to work to satisfy a debt owed to defendants. The first amended complaint alleges two possible sources of plaintiffs' indebtedness. First, plaintiffs allege that they incurred debts to third parties in order to pay the defendants' commissions and fees prior to arriving in the United States.[33] Such debts owed to third parties

---

[32]Rec. Doc. No. 30, at 15.

[33]Amd. Comp., ¶ 21-22.

abroad do not support a claim of peonage because those debts are not allegedly owed to defendants. Second, plaintiffs allege that certain unidentified "fees" were deducted from plaintiffs' paychecks while they were working at Quality Shipyards and that such deductions were claimed by defendants to be "debts" owed to plaintiffs.[34]  Plaintiffs allege that they were compelled to work for FSS to pay off these "fees."[35]

There are no allegations that defendants advanced any funds to plaintiffs.  Moreover, there are no allegations which permit an inference that the "fees" allegedly deducted from plaintiffs' paychecks were deducted to satisfy any underlying debt.  Additionally, plaintiffs have not pointed to any affidavit incorporated into the complaint containing any statement that any plaintiff owed a debt to defendants or that defendants had ever advanced or loaned plaintiffs any funds which could constitute a debt. The affidavits incorporated into the first amended complaint do not support the characterization of the "fees" as a debt owed to defendants.  Many of the plaintiffs who averred that they were employed by Quality Shipyards do not aver that any "fees" were ever deducted from their paychecks.  Of those plaintiffs who do claim that deductions were taken from their paychecks they aver that such deductions were payments for room and board expenses.[36]  Accepting the plaintiffs' affidavits as true, plaintiffs' averments do not support a claim of peonage because "the payment for food and lodging is not a debt owed to the defendants, but rather a monthly expense." *Does I v. The Gap, Inc.*, No. Civ. A. 01-0031, 2002 WL 1000068, at *17 (D. N. Mar. I. May 10, 2002)(holding that allegations that defendants deducted monthly charges for payment of food and lodging expenses do

---

[34]*Id.*, ¶¶ 34-36.

[35]*See id.*, ¶ 37.

[36]*See e.g.*, Pl. Aff. No. 6, affidavit of Sivakumar Vodamodula, at 3; Pl. Aff. No. 13, affidavit of Rajan George, at 3; Pl. Aff. No. 18; affidavit of Muraleed Haran Nayapulli, at 3.

not support a claim of peonage).

Additionally, liberally construing the allegations in favor of plaintiffs, plaintiffs have failed to sufficiently allege facts to support any inference that they were held in a state of involuntary servitude. Plaintiffs allege that they were "compelled to work . . .by threats and legal coercion, including but not limited to physical intimidation; brandishing/carrying of weapons (Chandler); threats of manipulation of visa status and deportation; confiscation of passports and immigration papers; threats of abuse of legal process, prosecution and arrest."[37]  Plaintiffs also allege that the consequences of not working for defendants, namely, returning to India without repaying their third-party debts, compelled plaintiffs to serve as defendants' forced labor pool.[38]

Virtually identical allegations were addressed in *Does I* on a motion to dismiss. In *Does I*, plaintiffs, a group of workers, alleged that the defendants held them in a state of involuntary servitude through the use of threats of physical abuse, threats of suspension, termination, and deportation, confiscation of passports, prosecution and arrest. *Does I*, 2002 WL 1000068, at *15 & n.29. Similar to the plaintiffs' allegations in this case, the *Does I* plaintiffs alleged that if they returned home, they would be subject to adverse consequences in their home countries. *Id.*  The *Does I* plaintiffs contended that their "special vulnerabilities – their impoverished state, the severe economic consequences they face, being stranded thousands of miles from home, and their lack of employment options, coupled with the physical and legal threats and coercion deprive them of their free will and choice and make them reasonably believe that they have no choice but to work." *Id.*

Considering those allegations, the court held:

---

[37]Amd. Comp., ¶ 37.

[38]*Id.*, ¶¶ 37, 48.

Even accepting as true the well-pleaded factual allegations of the threats and use of physical restraint and abuse and the threats and use of physical and legal coercion, coupled with the plaintiffs' alleged special vulnerabilities, the court cannot reasonably infer that the plaintiffs' free will had been overcome and that the plaintiffs had no choice but to work. The court still finds that the plaintiffs made a "choice, however painful" to work. *United States v. Kozminski,* 487 U.S. 931, 950 (1988). . . . As for the severe financial consequences the plaintiffs allegedly face if their employment is terminated or if they are deported, the court has already previously concluded that other "[c]ourts have repeatedly held that the financial consequences attending the quitting of one's job make the choice between continuing to work under adverse conditions and quitting employment an unpleasant choice, but nevertheless a choice." *See* [ *Doe I v. The Gap, Inc.,* 2001 WL 1842389, at *21]. Finally, while the plaintiffs' allegations of physical and legal threats of arrest, prosecution, and imprisonment by the defendants may give rise to involuntary servitude, the court concludes that without more factual information on who or how the arrest, prosecution, and imprisonment will be conducted, the plaintiffs' allegations are insufficient to support their claim of involuntary servitude.

The Court finds *Does I* persuasive on the facts of this case. The plaintiffs have not pointed to any affidavit in which any plaintiff averred that he was held against his will and forced to provide labor for the defendants. Nor are there any allegations that any plaintiff was physically restrained and compelled to work for the defendants. With respect to the alleged threats of deportation, the Court initially notes that the Supreme Court's statement in *Kozminski* that threatening an immigrant with deportation may be sufficient coercion to support a claim of involuntary servitude does not apply to plaintiffs. Section 101(a)(15)(H) of the INA specifically excludes temporary workers entering the United States pursuant to the H-2B visa program from the definition of an "immigrant." 8 U.S.C. § 1101(a)(15)(H)(ii)(b).[39] Moreover, the thrust of plaintiffs' affidavits is that Chandler threatened

---

[39]H-2B visa status is designed to permit temporary entry into the United States to fill a temporary need for services. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b); *Volt Technical Servs. Corp v. I.N.S.*, 648 F. Supp. 578, 581 (S.D.N.Y. 1986). Section 1101(a)(15)(H)(ii) has been interpreted to prevent the likelihood of so-called "temporary" workers from

to have plaintiffs deported in response to plaintiffs' demands for increased pay or better working conditions.[40] Although plaintiffs' decision to accept allegedly adverse working conditions may have been influenced by the possibility of deportation if they chose not to accept such conditions, the financial consequences to plaintiffs of choosing to return to India do not support a claim of involuntary servitude.  Moreover, the affidavits do not reasonably support an inference that such threats were made in an effort to compel plaintiffs to remain in defendants' employ.  Instead, the gravamen of much of the first amended complaint and plaintiffs' affidavits is that the defendants *could not* employ plaintiffs and that when plaintiffs complained about the lack of employment or other working conditions, plaintiffs were told by defendants that they could either return to India or find their own jobs and report such employment to defendants.[41]  Such allegations directly contradict any inference that the alleged threats resulted in plaintiffs' providing forced labor to defendants and do not support an inference that plaintiffs had no choice but to stay in the United States.

Plaintiffs allege that when they sought other jobs, some plaintiffs were arrested by immigration officials and defendants refused to intervene. These allegations also do not support a claim of involuntary servitude.  Although the choice between complying with the terms of their visas by either working for defendants' temporarily or returning to India once it became clear to them that FSS allegedly could not employ them may have been a painful choice, it was nevertheless a choice.

---

entering the United States permanently under the less rigorous standard applicable to temporary workers rather than applying properly as immigrants under the more stringent preference classification applicable to aliens seeking to immigrate to the United States. *Volt*, 648 F. Supp. at 581.

[40]*See e.g.*, Pl. Aff. No. 12, affidavit of Hareesh Janardhanan Chettiyar, at 3; Pl. Aff. No. 13, affidavit of Rajan George, at 3; Amd. Comp., at ¶ 41.

[41]*See e.g.*, Pl. Aff. No. 13, at 3 (stating that Chandler told a coordinator to make a list of complaining workers and that "those people would be sent back to India immediately."); Pl. Aff. No. 13, at 3 (stating that when workers asked Chandler and other persons what happened to the employment agreement made in India, "they told us that if we didn't like the deal we could go back to India . . . ."); Amd. Comp., ¶ 39.